**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA
U.S. Department of Justice
Antitrust Division
450 Fifth Street, N.W., Suite 8700
Washington, D.C. 20530,

and

STATE OF CALIFORNIA
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102,

                    *Plaintiffs,*

          v.

TAIHEIYO CEMENT CORPORATION
Bunkyo Garden Gate Tower
1-1-1, Koishikawa
Bunkyo-ku, Tokyo
Japan,

CALPORTLAND COMPANY
10655 W. Park Run Drive, Suite 275
Las Vegas, NV 89144,

and

VULCAN MATERIALS COMPANY
1200 Urban Center Drive
Birmingham, AL 35242,

                    *Defendants.*

## **COMPLAINT**

Taiheiyo Cement Corporation ("Taiheiyo"), through its subsidiary CalPortland Company

("CalPortland"), and Vulcan Materials Company ("Vulcan") are two of the leading suppliers of

ready-mix concrete in San Diego County, California. Taiheiyo's proposed acquisition of Vulcan's

ready-mix concrete operations in California may substantially lessen competition in the market for the production, distribution, and sale of ready-mix concrete in San Diego County in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. The proposed acquisition should therefore be enjoined.

## I.    NATURE OF THE ACTION

1.    Ready-mix concrete is a widely used building material that is essential to building infrastructure, such as bridges, tunnels, and highways; commercial buildings, such as offices, hotels, apartments, skyscrapers, warehouses, and parking structures; and residences, including single-family homes, duplexes, and townhouses. Ready-mix concrete is also used in housing foundations, driveways, patios, and swimming pools.

2.    In San Diego County, California, CalPortland and Vulcan are two of the largest producers, distributors, and sellers of ready-mix concrete. Competition between them has ensured lower prices and better quality and service for customers. CalPortland now proposes to acquire Vulcan's competing ready-mix concrete assets in California, including in San Diego County, for approximately $712 million under the terms of an October 27, 2025 asset purchase agreement.

3.    CalPortland's acquisition risks competitive harm by eliminating substantial head-to-head competition and by consolidating suppliers of ready-mix concrete in San Diego County. As a result, the proposed acquisition may substantially lessen competition in the production, distribution, and sale of ready-mix concrete in San Diego County, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and should be enjoined.

## II.    DEFENDANTS AND THE PROPOSED TRANSACTION

4.    Defendant Taiheiyo is a Japanese corporation with headquarters in Tokyo, Japan. Taiheiyo produces and sells construction materials and mineral resources, such as cement, ready-mix concrete, and aggregates, in several countries, including the United States. Taiheiyo operates in the United States through its subsidiary CalPortland. Taiheiyo reported total revenues of more than $5.5 billion for fiscal year 2025.

5.    Defendant CalPortland is a privately held, wholly-owned indirect subsidiary of Taiheiyo. It is incorporated in California with headquarters in Las Vegas, Nevada. CalPortland is one of the largest suppliers of construction materials, including cement, ready-mix concrete, aggregate, asphalt, and construction materials, in the western United States and Canada. In the United States, CalPortland has operations in California, Washington, Oregon, Nevada, Arizona, and Alaska. In California, CalPortland owns cement, ready-mix concrete, asphalt, and aggregate operations.

6.    Defendant Vulcan is incorporated in New Jersey with headquarters in Birmingham, Alabama. Vulcan is one of the largest producers of construction materials in the United States, with operations in 22 states and the District of Columbia. Vulcan is also the largest producer of aggregate in the United States. Vulcan has ready-mix concrete operations in five states and the District of Columbia and asphalt operations in six states. In California, Vulcan owns aggregate, ready-mix concrete, and asphalt operations. In 2025, Vulcan reported total revenues of approximately $7.9 billion.

## III.    BACKGROUND

7.    Ready-mix concrete is a building material made up of a combination of cement, fine and coarse aggregate, small amounts of chemical additives, and water. The amount of

3

cement added to a concrete mixture determines its strength, which is measured in pounds per square inch ("psi"). To ensure structural integrity, durability, and workability for each particular project, ready-mix concrete suppliers custom produce the concrete for each project according to the specifications supplied by the customer. Ready-mix concrete with higher psi ratings is typically used for large infrastructure projects, such as highways and bridges, and large buildings, while ready-mix concrete with lower psi ratings is often used for residential and curb-and-gutter construction projects.

8.     Because customer needs can vary significantly from project to project, ready-mix concrete is typically sold pursuant to bids, for which customers provide extensive specifications regarding, among other things, the amount of concrete, the various strengths of concrete, and the size and timing of the concrete pours.

9.     A supplier who wins a bid makes the ready-mix concrete at production facilities called batch plants and delivers the concrete to the customer. A batch plant measures the precise amount of dry input products needed to manufacture a given type of concrete. The mixture is then dumped into a rotating drum mounted on a heavy-duty truck. Immediately before the truck departs the plant, a measured amount of water is added. Once the water hits the dry mixture, an irreversible chemical reaction is triggered causing the product to begin to set into a rigid building substance. The concrete components are mixed by the rotating drum while the truck is being driven to the job site. At the job site, the concrete is poured directly from the truck onto the project. The rotating drums prevent the concrete from hardening during the travel from the plant to the project site.

10.     Because concrete begins to set while being driven to the job site, it is highly perishable. Contractors and state departments of transportation typically limit the time concrete

can spend in a truck to 90 minutes or less. This time may be even shorter depending on weather conditions. This time is measured from the moment the water hits the dry concrete inputs in the truck until the concrete is poured out of the truck. If the concrete is not poured within this 90-minute window, the wet mix hardens and is rendered unusable. Because of this 90-minute window, contractors and state departments of transportation typically allow only a portion—often only 30 minutes—to be consumed by driving time. If the concrete is driven for a longer period of time, there may be insufficient time for the concrete to be completely poured onto the project within the 90-minute window.

11.    As ready-mix concrete is hauled greater distances, the increased transportation costs diminish the profitability of a load of concrete. For these reasons, ready-mix concrete suppliers attempt to stay close to their batch plants and ready-mix concrete customers require local suppliers.

12.    Depending on the project, ready-mix concrete customers may have varying needs, including the mix and psi specifications, the volume needed, the delivery conditions, and the quality of the product and service. Not all suppliers of ready-mix concrete can satisfy customers' needs for every kind of project. For example, servicing certain types of large projects, such as bigger infrastructure projects and commercial buildings, requires ready-mix concrete suppliers to be able to provide: (a) a large number of cubic yards of concrete; (b) large daily pours of concrete, which require the concrete supplier to schedule trucks to arrive continuously at a project; (c) concrete having multiple psi specifications; (d) proven concrete mix designs; and (e) testing and quality control procedures to ensure the concrete meets project engineering specifications.

13.    Contractors building large projects carefully select suppliers to minimize the chances of problems with concrete. If concrete is defective because it does not meet the project specifications or the concrete is not poured continuously, the customer may suffer substantial direct and consequential losses. Customers can also suffer substantial financial and reputational harm from delivery delays due to idle workers and equipment and project delays.

14.    Purchasers of ready-mix concrete for large projects require that their suppliers have: (a) multiple ready-mix concrete plants in a geographic area; (b) the ability to produce large amounts of concrete with multiple specifications; (c) proven concrete mix designs; (d) a large number of concrete trucks; (e) a sizeable and well-trained workforce; (f) the demonstrated ability to service such a large project; and (g) considerable financial backing to remedy any problems relating to defective concrete.

15.    Each large project is bid separately and ready-mix concrete suppliers can identify the specific market conditions that apply to each large project, including the number of competitors that potentially could service the project's requirements. Ready-mix concrete suppliers can and do charge different prices, net of costs, to customers based on the particular project's requirements and the market conditions.

## IV.    RELEVANT MARKETS

### A.    Relevant Product Market

16.    The production, distribution, and sale of ready-mix concrete is a relevant product market. Ready-mix concrete is unique because it is pliable when freshly mixed, can be molded into a variety of forms, and is strong and permanent when hardened. For many building applications, customers will not substitute other building materials, such as steel, wood, or asphalt, for ready-mix concrete. Steel is often not a substitute for ready-mix concrete because it

6

cannot be poured and formed into smooth, regular planes. Wood is often not a substitute because it does not have the structural strength to support heavy loads. Asphalt is often not a substitute because it cannot be used for the structural portions of bridges, cannot be used for buildings, and, for certain applications, cannot be used for highways.

17.     A small but significant and non-transitory increase in the price of ready-mix concrete would not cause customers to substitute another building material in sufficient quantities with sufficient frequency to make such a price increase unprofitable. Accordingly, the production, distribution, and sale of ready-mix concrete is a line of commerce and a relevant product market within the meaning of Section 7 of the Clayton Act.

**B.      Relevant Geographic Market**

18.     Ready-mix concrete is most often bid on a project-by-project basis. For these projects, ready-mix concrete suppliers can identify the specific market conditions that apply to each customer's project, including the number of competitors that potentially could service the location of the project. Ready-mix concrete suppliers can target specific customers for a price increase based on the particular location of a project and the number and capabilities of rivals that can service that customer.

19.     The ready-mix concrete purchasers that are potentially affected by this acquisition are located in San Diego County. Due to the location and transportation constraints described above, these customers typically cannot turn to suppliers outside this area for their ready-mix concrete needs. The purchasers in San Diego County are similarly situated with respect to the competitive impact of this acquisition and can therefore be aggregated for analytical convenience.

20.     Ready-mix concrete is perishable and the cost of transporting it is high compared to the value of the product. Thus, depending on the size of a metropolitan area and typical traffic conditions within that area, the distance concrete can reasonably be transported is generally limited to a metropolitan area or, in many cases, only a portion of that area. This is particularly true for large projects, such as highways, bridges, and high-rise buildings.

21.     In San Diego County, the suppliers with the ability to bid on ready-mix concrete projects, and particularly ready-mix concrete for large projects, are most often those with plants located within 30 minutes, and to a lesser extent 60 minutes, of driving time to the project site. This timeframe accounts for unpredictable traffic and other unforeseen delays that may arise on a project site. Accordingly, the production, distribution, and sale of ready-mix concrete to customers in San Diego County is therefore a relevant market within the meaning of Section 7 of the Clayton Act. The producers that participate in this market are those that are also located in San Diego County.

## V.     ANTICOMPETITIVE EFFECTS

22.     The proposed acquisition is likely to substantially lessen head-to-head competition in the production, distribution, and sale of ready-mix concrete in San Diego County. In San Diego County, CalPortland and Vulcan are two of the largest suppliers of ready-mix concrete and two of only a small number of suppliers that can supply ready-mix concrete to customers with large projects.

23.     Combined, Cal Portland and Vulcan have a share of over 50 percent in the market for ready-mix concrete in San Diego County. The market for ready-mix concrete is already highly concentrated and, as evidenced by the parties' combined share, would be significantly more concentrated after the proposed acquisition.

24.     CalPortland and Vulcan compete directly against one another in San Diego County to provide ready-mix concrete to customers. Price competition between CalPortland and Vulcan in the production, distribution, and sale of ready-mix concrete has benefitted customers. CalPortland and Vulcan also vie to win customers' business by offering quality products, reliable delivery, and superior customer support.

25.     CalPortland's proposed acquisition of Vulcan's ready-mix concrete assets in San Diego County would eliminate the competition between them and its benefits to customers. The proposed acquisition would substantially increase the likelihood that CalPortland would unilaterally increase the price of ready-mix concrete to a significant number of customers. The acquisition would also substantially increase the likelihood that CalPortland would reduce the quality of its products or its service. The presence of other ready-mix concrete suppliers would not be sufficient to constrain a unilateral exercise of market power by CalPortland after the acquisition.

26.     In addition, customers that require ready-mix concrete for use in large projects may be more severely affected by the acquisition. The number of competitors that could constrain CalPortland post-acquisition from raising prices for those customers is smaller than the total number of ready-mix concrete suppliers because it is limited to companies that meet the requirements imposed by customers for large ready-mix concrete projects.

27.     Further, the elimination of CalPortland and Vulcan as independent competitors in the production, distribution, and sale of ready-mix concrete is likely to facilitate anticompetitive coordination among the remaining producers in bidding to customers in the relevant geographic market. Suppliers in this industry have access to information about competitors' output, capacity, and costs. Given these market conditions, eliminating an important ready-mix concrete supplier

9

is likely to further increase the ability of the remaining competitors to successfully coordinate, reducing the benefits of competition to consumers.

28.    In sum, after the proposed acquisition, CalPortland likely would have the incentive and ability to profitably raise prices and reduce the product and service quality of ready-mix concrete in San Diego County. The proposed acquisition would likely also facilitate anticompetitive coordination among ready-mix concrete suppliers in San Diego County, which also likely would result in higher prices and other anticompetitive effects. The proposed acquisition, therefore, may substantially lessen competition in the markets for ready-mix concrete in San Diego County in violation of Section 7 of the Clayton Act.

## VI.    ABSENCE OF COUNTERVAILING FACTORS

29.    Entry of new competitors into the market for the production, distribution, and sale of ready-mix concrete to customers in San Diego County will not be timely, likely, or sufficient to prevent the loss of competition that would result from CalPortland's acquisition of Vulcan's California ready-mix concrete operations.

30.    Opening a ready-mix concrete batch plant in a metropolitan area is difficult and time consuming due to the need to acquire the land on which to build a batch plant. The location of a batch plant is very important because of the perishability of the ready-mix concrete. Finding the appropriate site for such a plant close enough to projects is difficult, because in metropolitan areas such land is frequently already utilized or does not have the appropriate zoning. Further, obtaining the land-use permits or zoning variances and necessary environmental permits is difficult, costly, and time consuming. In addition to building the new batch plant, an entrant

would also have to secure sources of cement and aggregate, which are inputs into ready-mix concrete.

31.    Successful entry or expansion into the production, distribution, and sale of ready-mix concrete for customers with large projects is even more difficult, time-consuming, and costly. To be able to bid on large projects, it is not enough simply to be able to produce ready-mix concrete. To bid on these large projects, a new entrant or an existing producer must have multiple ready-mix concrete plants in a geographic area, the ability to produce large amounts of concrete with multiple specifications, backup plants, a large number of concrete trucks, proven mix designs, a sizeable and well-trained workforce, the demonstrated ability and reputation to be able to service such a large project, and considerable financial backing to remedy any problems relating to defective concrete.

32.    As a result of these high barriers, entry into the market for the production, distribution, and sale of ready-mix concrete to purchasers in San Diego County would not be timely, likely, or sufficient to defeat the substantial lessening of competition that would likely result from CalPortland's acquisition of Vulcan's ready-mix concrete operations in California.

## VII.    JURISDICTION AND VENUE

33.    The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

34.    The State of California brings this action under Section 16 of the Clayton Act, 15 U.S.C. § 26, as *parens patriae* on behalf of and to protect its general economy and the health and welfare of its residents and to prevent and restrain Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.

35.     Defendants' activities in the production, distribution, and sale of ready-mix concrete, aggregate, asphalt and other construction materials substantially affects interstate commerce. This Court has subject-matter jurisdiction over this action pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1331, 1337(a), and 1345.

36.     Defendants have consented to venue and personal jurisdiction in this judicial district. Venue is therefore proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391(c).

## VIII.   VIOLATION ALLEGED

37.     CalPortland's acquisition of Vulcan's ready-mix concrete operations in California may substantially lessen competition in the production, distribution, and sale of ready-mix concrete in San Diego County in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

38.     Unless enjoined, the proposed acquisition would have the following anticompetitive effects, among others:

(a) elimination of actual and potential competition between CalPortland and Vulcan in the production, distribution, and sale of ready-mix concrete in the relevant geographic market;

(b) substantially lessened competition in the production, distribution, and sale of ready-mix concrete in the relevant geographic market; and

(c) higher prices and reduced quality and service for ready-mix concrete in the relevant geographic market.

## IX.    REQUEST FOR RELIEF

39.    Plaintiffs request that this Court:

(a) adjudge and decree CalPortland's proposed acquisition of Vulcan's California ready-mix concrete operations to be unlawful and violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(b) preliminarily and permanently enjoin and restrain Defendants and all persons acting on their behalf from consummating the proposed acquisition of Vulcan's California ready-mix concrete operations, or from entering into or carrying out any other contract, agreement, plan, or understanding, the effect of which would be to combine CalPortland and Vulcan's California ready-mix concrete operations;

(c) award the United States and the State of California its costs for this action; and

(d) award the United States and the State of California such other and further relief as the Court deems just and proper.

Dated: May 21, 2026

Respectfully submitted,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

OMEED A. ASSEFI (DC Bar #252705)
*Acting Assistant Attorney General*

G. CHARLES BELLER (DC Bar #1645076)
*Deputy Assistant Attorney General*

JARED T. BOND
*Acting Deputy Director of Civil Enforcement*

SOYOUNG CHOE
*Acting Chief, Defense, Industrials, and Aerospace Section*

DANIEL MONAHAN
*Assistant Chief, Defense, Industrials, and Aerospace Section*

    /s/ Christine A. Hill
CHRISTINE A. HILL (DC Bar #461048)*
MIRANDA ISAACS
*Trial Attorneys*

U.S. Department of Justice
Antitrust Division
Defense, Industrials, and Aerospace Section
450 Fifth Street NW, Suite 8700
Washington, DC 20530
Tel.: (202) 386-1744
Fax: (202) 514-9033
Email: christine.hill@usdoj.gov

*LEAD ATTORNEY TO BE NOTICED

**FOR PLAINTIFF STATE OF CALIFORNIA:**

ROB BONTA
*Attorney General of California*

PAULA BLIZZARD
*Senior Assistant Attorney General*

MICHAEL JORGENSON
*Supervising Deputy Attorney General*

    /s/ Cari Jeffries
CARI JEFFRIES (DC Bar #1600843)
BRIAN WANG
ELIZABETH CHEEVER
*Deputy Attorneys General*

Office of the Attorney General of California
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
Tel.: (415) 510-4400
Email: cari.jeffries@doj.ca.gov
       brian.wang@doj.ca.gov